# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

AMANDA L. PIERNER-LYTGE,

                Plaintiff,

v.

MONTRELL E. HOBBS and
FREDRICK GLADNEY,

                Defendants.

Case No. 20-CV-567-JPS

**ORDER**

## 1.    INTRODUCTION

On April 7, 2020, Plaintiff Amanda L. Pierner-Lytge ("Plaintiff") filed the present civil rights action, alleging that Defendants violated her First and Fourth Amendment rights during her arrest. ECF No. 1. On March 15, 2022, Defendants filed a motion for summary judgment. ECF No. 18. That motion is fully briefed, and the Court will grant it.

## 2.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or

determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

3.     **RELEVANT FACTS**[1]

Plaintiff is an adult female who resides in the City of West Allis and is employed as a private security officer. Plaintiff sometimes openly carries firearms in public. She believes that by openly carrying firearms she will bring attention to the Second Amendment. When Plaintiff openly carries firearms, she also carries a portable police scanner because people frequently call the police to report that she is carrying a firearm in public. People call 911 when Plaintiff is openly carrying because they are concerned about somebody walking down the road openly carrying a gun. Plaintiff admits that when she openly carries firearms it causes a disturbance in her neighborhood. For example, on October 29, 2019, Plaintiff had contact with the West Allis Police Department after they were called about her openly carrying an AR-15 rifle in Rainbow Park in the City of West Allis. On February 23, 2020, Plaintiff had contact with the Wauwatosa police department when she was openly carrying a rifle.

At issue in this case is Plaintiff's contact with the Milwaukee County Sheriff's Office (the "Sheriff's Office") on Sunday, April 1, 2020. That afternoon, Plaintiff walked from her home to Rainbow Park with a rifle with a spike bayonet affixed to it strapped to her back. She also had a black semi-automatic handgun on her right hip, and a duty belt with pepper spray, a baton, and two pair of handcuffs on her person. Her duty belt was similar

---

[1] The parties submitted a stipulated statement of undisputed, material facts. ECF No. 17. For purposes of summary judgment, the Court will adopt the stipulated facts with minor, non-substantive edits.

to those used by Sheriff's Office deputies, with the exception of a taser and radio holster. Plaintiff testified that she armed herself because she had heard reports of coyotes in the area, did not feel safe without a firearm, and wanted to draw attention to open-carry rights.

Montrell Hobbs ("Deputy Hobbs") is a deputy sheriff for the Sheriff's Office; Frederick Gladney ("Sergeant Gladney") is a Sergeant for the Sheriff's Office. At approximately 6:57 p.m., Deputy Hobbs was dispatched to Rainbow Park on reports of a person with firearms and other weapons sitting near the park's baseball field. Rainbow Park is close to Walker Elementary School. The witness who called the Sheriff's Office dispatch reported that there were "lots of kids and families around" at the time. There had been two other calls to West Allis dispatch regarding Plaintiff.

When Deputy Hobbs arrived on the scene, he spoke with one of the witnesses who had called 911 to report Plaintiff's activities. The witness informed Deputy Hobbs that Plaintiff was sitting on the bleachers near the baseball field and had been sitting there for approximately ten minutes, watching families walk by. The witness stated that Plaintiff was sitting on the bleachers and had a rifle, which made the witness and her family feel uncomfortable. She said that she had observed multiple families walk past Plaintiff.

Deputy Hobbs observed Plaintiff sitting on the bleachers near the baseball diamond, smoking a cigarette. He saw that she had a rifle with a bayonet. Deputy Hobbs waited for backup to arrive before approaching Plaintiff because he could see that she had a rifle with a spike bayonet strapped to her back. Once backup arrived, the officers approached Plaintiff, identified themselves, and explained the reason for the contact.

Page 3 of 14
Case 2:20-cv-00567-JPS    Filed 05/05/22    Page 3 of 14    Document 24

Plaintiff recorded her interactions with the Sheriff's Office on her cell phone. Deputy Hobbs did not know that Plaintiff was recording, did not tell Plaintiff to stop recording, and did not interfere with the recording of the encounter. Plaintiff verbally identified herself to Deputy Hobbs.

The officers asked Plaintiff what she was doing in the park and whether she had a concealed carry license (a "CCW"). Plaintiff stated that she did have a CCW but that she was not sure if she had it with her. Plaintiff did not have any identification or a CCW on her at that time. The officers were able to confirm with dispatch that Plaintiff was issued a valid CCW. Plaintiff informed Deputy Hobbs that she was in the park exercising her Second Amendment rights and playing Pokémon Go (although Plaintiff admitted that she could not record her interactions and play Pokémon Go at the same time). Deputies told Plaintiff that they had received several 911 calls from people concerned about Plaintiff being in the park with a rifle.

Sergeant Gladney arrived on the scene as the supervising officer. When he arrived, other deputies were already interacting with Plaintiff. He was able to see Plaintiff's rifle with a spike bayonet affixed to it. Sergeant Gladney stated that it is "unusual" to see a person in the park with a spike bayonet affixed to a rifle.

At some point during the contact, but prior to an arrest being made, at Plaintiff's request, Deputy Hobbs and Sergeant Gladney consulted with the West Allis Police Department. The West Allis Police Department told the officers that Plaintiff had multiple similar contacts with that agency while openly carrying firearms, was "very into her [S]econd [A]mendment rights," and had been the subject of "Chapter 51" (mental health detention) proceedings on six different occasions. The West Allis Police Department

Page 4 of 14
Case 2:20-cv-00567-JPS   Filed 05/05/22   Page 4 of 14   Document 24

informed Hobbs and Gladney that, in the past, Plaintiff had resisted arrest and made threats to officers.

Plaintiff was instructed to slowly remove the rifle with the bayonet from her back and place it on the ground. She complied. Plaintiff asked if she was being detained; officers told her that she was being detained but that she was not being placed in handcuffs at that point. Officers collected Plaintiff's rifle, bayonet, handgun, and duty belt and turned them over to Deputy Hobbs. The handgun was a loaded Glock 17 9mm. The rifle was a Mosin Nagant, with a spike bayonet affixed to it. According to the parties, Mosin Nagants draw a lot of attention because they are very large rifles. The spike bayonet was sold to Plaintiff along with the rifle.

A spike bayonet bolts on to the end of the barrel of a Mosin Nagant. The bayonet bolts on through a hollow piece of pipe that allows one to mount it to the barrel but still shoot the weapon. The spike bayonet that was affixed to Plaintiff's rifle does not have a handle. Plaintiff's bayonet is described as a "spike" or "cross" bayonet, meaning it has four flutes and is designed for impaling as opposed to cutting. Plaintiff's bayonet is not like a sword or a machete; it is more pointed, or diamond shaped, as it goes to a point. The apex resembles a triangular type of weapon. The parties state that bayonets are used for hand-to-hand combat or other close-quarter combat and that they are designed to penetrate the human body to cause injury or death. Plaintiff's bayonet is approximately 14 to 21 inches long, and, when attached to the rifle, it totals five feet long.

Officers secured all of these items into evidence. The officers on the scene held Plaintiff's firearms for safekeeping—standard procedure for any arrest. Deputy Hobbs requested another deputy transport the secured

weapons to the Sheriff's Office's Wauwatosa substation. There, the property was inventoried as it was part of the arrest.

Plaintiff was arrested for disorderly conduct while armed. Deputy Hobbs recommended that they arrest Plaintiff for disorderly conduct, and Sergeant Gladney and Captain Paul Thompson agreed. Deputy Hobbs was the arresting officer. The officers discussed and believed that there was probable cause to arrest Plaintiff for disorderly conduct while armed. They believed that she violated the last part of the disorderly conduct statute that prohibits "otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Deputy Hobbs considered that the otherwise disorderly conduct that tended to cause or provoke a disturbance was the presence of the bayonet. Sergeant Gladney believed that Plaintiff had engaged in disorderly conduct because they had received several 911 calls about her causing a disturbance in the park by her actions of walking around with a gun and bayonet and, as people put it, acting strange and bizarre. Sergeant Gladney was concerned about the bayonet because he had never encountered anybody open carrying with a bayonet before. In his estimation, there was no reason to carry the bayonet as opposed to just a gun. Sergeant Gladney concluded that the bayonet would scare a lot of people.

Prior to arresting Plaintiff, Sergeant Gladney told her to put her cell phone down so that officers could handcuff her. Sergeant Gladney advised Plaintiff that she was being detained and stated to her, "I am going to have you stop recording and sit on that bench." At that point, the parties agree that Plaintiff was detained and that her weapons were seized. The Sheriff's Office's policy rational is that it does not want an arrestee to be able to contact any family members or friends to come to the scene to stop the

apprehension or the arrest. Plaintiff was able to record her interaction with the Sheriff's Office on April 1, 2020 up until this point. After Sergeant Gladney told Plaintiff to stop recording and sit down, she complied. Sergeant Gladney instructed Plaintiff to place her cell phone down so he could place her in handcuffs. Officers told her to place her rifle on the ground, and they removed her duty belt.

Because of the COVID-19 pandemic, the Sheriff's Office was not taking arrestees to jail and, instead, was issuing "order-in" cards which required an arrestee to appear at the Milwaukee County District Attorney's office at a later date. Accordingly, Plaintiff was not transported to jail, but rather given an order to appear at the District Attorney's office on June 9, 2020. Officers followed all other arrest procedures, such as seizing any property that was involved in the offense.

Body cam footage shows Sergeant Gladney speaking with Plaintiff and captures his statement to her that she is in the park with a "gun with a bayonet" affixed to it and that that "is not acceptable." It also shows Sergeant Gladney records his statement to Plaintiff that she was being detained and that Sergeant Gladney stated, "I am going to now have you stop recording and sit on that bench." At that point Plaintiff was detained and her weapons were seized.

The Milwaukee County District Attorney's office did not ultimately charge Plaintiff with disorderly conduct. On April 15, 2021, Plaintiff petitioned for the return of her property with the Milwaukee County Circuit Court. The Circuit Court ordered the return some of the property on May 17, 2021, and the rest of the property on June 10, 2021. Plaintiff has received all of her property back from the Sheriff's Office.

## 4. ANALYSIS

### 4.1 Fourth Amendment: Probable Cause to Arrest

The Fourth Amendment protects people from being seized, or having their property seized, without probable cause. *See Gonzalez v. Village of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012). To prevail on a claim of unlawful arrest or seizure, "a plaintiff must show that the arresting officer lacked probable cause to make the arrest." *Id.* "An officer has probable cause to arrest if he has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime." *Id.* In other words, "[p]robable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013).

"[P]robable cause deals not with hard certainties but with probabilities." *Id.* "It is a practical, commonsense, nontechnical, and fluid conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (internal citations and quotations omitted). "Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.* The focus is on what the officer knew at the time of the arrest and whether those facts and circumstances, "viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (internal citations and quotations omitted). When the underlying facts are undisputed, a court can decide as a matter of law whether a seizure was supported by probable case. *Id.*

Plaintiff was arrested for the crime of "disorderly conduct" in violation of Wisconsin Statute § 947.01(1) when she was in a public park armed with a bayonet. Disorderly conduct is defined under Wisconsin law as follows:

> (1) Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.
>
> (2) Unless other facts and circumstances that indicate a criminal or malicious intent on the part of the person apply, a person is not in violation of, and may not be charged with a violation of, this section for loading a firearm, or for carrying or going armed with a firearm or a knife, without regard to whether the firearm is loaded or the firearm or the knife is concealed or openly carried.

Wis. Stat. § 947.01.

The state must establish two elements to convict under this statute: (1) the defendant "engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or *similar disorderly conduct*;" and (2) the defendant's conduct "occurred under circumstances where such conduct tends to cause or provoke a disturbance." *State v. Schwebke*, 644 N.W.2d 666, 674 (Wis. 2002) (internal citations and quotations omitted) (emphasis added). The "otherwise disorderly" provision has been interpreted to "mean conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *Id.* (internal citations and quotations omitted). "An objective analysis of the conduct and circumstances of each particular case must be undertaken because what may constitute disorderly conduct under some circumstances may not under others." *Id.* "[T]he statute is appropriately applied in

instances where conduct, under the circumstances, has a tendency to provoke a disruption to the public peace, public safety, or public order or is likely to cause a reaction from the community based on the fact that the public peace, public order, or public safety is being threatened." *Id.* at 676.

The Wisconsin Supreme Court reads the otherwise disorderly clause "quite broadly." *Gonzalez*, 671 F.3d at 656. "[T]he 'otherwise disorderly' clause requires only that the defendant's conduct be similar in kind to the conduct enumerated in the statute and that it have a *tendency* to cause or provoke a disturbance, either public or private; it need not actually cause a disturbance." *Id.* (citing *Schwebke*, 644 N.W.2d at 674–75).

As a starting point, the parties argue whether a bayonet falls into the firearm and/or knife exception of § 947.01(2). There is no doubt that the rifle, upon which the bayonet was affixed is, on its own, a firearm. The question is whether the bayonet is a "knife" or whether the presence of the bayonet transforms the entire weapon into its own category, outside the scope of the statutory exception. Both parties cite dictionary entries for "knife." ECF Nos. 19 at 6, 21 at 2–3. They discuss different types of bayonets, the sharpness of their edges, and their purposes. This war of definitions can keep lawyers busy for hours—here, it has. But the law seeks to protect police from these in-the-field debates.

Under the doctrine of qualified immunity, public officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light

most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal citations omitted). The probable-cause standard inherently allows room for reasonable mistakes, and "qualified immunity affords an added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott*, 705 F.3d at 714.

At the time Defendants arrested Plaintiff, there was no clearly established law that a bayonet on a rifle is afforded the protection of § 947.01(2). There is no guidance, case law, or other authority to guide an officer on whether a spike bayonet is a "knife" as that term is used in Wis. Stat. § 947.01(2). There is no guidance, case law, or other authority that would provide an officer with advance notice that carrying a bayonet in a busy park does not fit within the definition of disorderly conduct.[2]

Further, the circumstances confronting Defendants show that Plaintiff's presence in the park *actually* disrupted good order and provoked a disturbance. Park goers were calling 911 reporting that Plaintiff's armed presence in the park made them fear for themselves and their families. When officers arrived, they were met with a citizen armed with a bayonet. Under the circumstances presented, an objectively reasonable police officer facing a woman with a bayonet on a rifle in a public park could conclude

---

[2]"To overcome a defendant's qualified immunity defense, plaintiff must identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment" or that "existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1020 (W.D. Wis. 2020) (internal citations omitted).

that Plaintiff's conduct had "a tendency to provoke a disruption to the public peace, public safety, or public order" or was "likely to cause a reaction from the community." Under settled law and in light of the legal uncertainties about bayonets, Defendants acted reasonably.[3]

### 4.2 First Amendment: Recording the Police During Arrest

Plaintiff claims that Sergeant Gladney ordering her to stop recording the officers violated her First Amendment rights. Defendants argue that because Sergeant Gladney did not prohibit Plaintiff from recording her interactions with the officers until officers arrested her, Sergeant Gladney did not violate her First Amendment rights.

While the First Amendment protects the right to record police activity, that right is not absolute. *See Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). "It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." *Id.* For example, "it is beyond debate that an officer acts within constitutional boundaries when he demands that a bystander/citizen engaged in recording a particular scene depart from the area when there is a need to secure public safety or to protect the integrity of a crime scene." *Brown v. Robinett*, No. 119CV02336SEBMJD, 2021 WL 663378, at *8 (S.D. Ind. Feb. 19, 2021). But, as all parties agree, the issue presented here is largely unexplored in the Seventh Circuit: whether the First Amendment protects the right to record police while being arrested.

---

[3] The Court need not address the parties' discussion of the community caretaking exception.

Defendants discuss several cases from the Southern District of New York. In *Higginbotham v. City of New York*, at the motion to dismiss stage, the district court considered whether a professional journalist who was "present [at the scene of an arrest] to record a public demonstration for broadcast and not a participant in the events leading up to the arrest he was filming," had a right to the record the arrest of a protestor. 105 F. Supp. 3d 369, 372 (S.D.N.Y. 2015). According to the court, "[t]here [was] nothing in the complaint suggesting that his filming interfered with the arrest." *Id.* The court first noted that,

> [c]ertainly, the right to record police activity in a public space is not without limits, and some uncertainty may exist on its outer bounds. For instance, it may not apply in particularly dangerous situations, if the recording interferes with the police activity, if it is surreptitious, ***if it is done by the subject of the police activity***, or if the police activity is part of an undercover investigation.

*Id.* at 381 (emphasis added). However, because the journalist was not himself being arrested or participating in the demonstration, and "in light of the case law . . . a reasonable police officer would have been on notice that retaliating against a non-participant, professional journalist for filming an arrest . . . would violate the First Amendment." *Id.*

As Defendants discuss, *Higginbotham* is easily distinguishable from the present case. Unlike the journalist in *Higginbotham*, Plaintiff was being arrested at the time she was ordered to stop recording—she was the "subject of police activity." *Id.* As both parties stipulate, the Sheriff's Office's policy reason for not allowing arrestees to film their arrest is that the police "[do] not want an arrestee to be able to contact any family members or friends to come to the scene to stop the apprehension or the arrest." ECF

Page 13 of 14
Case 2:20-cv-00567-JPS   Filed 05/05/22   Page 13 of 14   Document 24

No. 17 at 7. This appears to be a "reasonable step[] to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." *Alvarez*, 679 F.3d at 607.

Considering the limited case law in this circuit, in combination with the rationale stated in *Alvarez* and *Higginbotham*, the Court concludes that Plaintiff's right to film the officers *while they arrested her* was either absent or not clearly established. Plaintiff has not established that, as an arrestee, she had the right to film her own arrest during the arrest. At the very least, Sergeant Gladney has qualified immunity. A reasonable officer in Sergeant Gladney's position would not have been on notice from clearly established law that prohibiting Plaintiff from recording her own arrest would violate her First Amendment rights.

5. **CONCLUSION**

For the reasons explained above, the Court will grant Defendants' motion for summary judgment and dismiss this case with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 18, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 5th day of May, 2022.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge